Next case will be 075046 Pacific Gas and Electric Company v. United States Good morning, Your Honors. Carter Phillips for PG&E. I regret that this is going to seem a bit of a deja vu all over again because, obviously, the issues that we have in this case are essentially the same issues that you had in the last case. My question, Mr. Phillips, can you help us decide what is the contractual mitigation rate? I think there are three elements, and probably a fourth one, but it's sort of extra contractual. I think the three elements of the contract at least tell you that the 900 number, that the 1991 number, cannot be the right one. The first one is the price. There is no way that at a price of 1 mil per kilowatt hour of electricity produced by these nuclear reactors you could remotely justify the very limited amount that's being taken here. The understanding has to be that there is going to be a significantly greater amount than what the government comes up with in 1992. You heard Mr. Lester, though. He said, well, we were just getting started. This was going to be a long, long process. Why isn't that then an appropriate gauge of mitigation? It's a low rate, but it was a low starting rate, and you agreed to it. Well, we didn't agree to it. I mean, we were handed a couple of numbers, and we were told that if we asked for any number that exceeded the number that we were told, it would be rejected out of hand, and so then we submitted a number that was consistent with it, so we complied with our regulatory obligations. The notion that there was any serious agreement to that seems to me as completely silly. What we agreed to was we agreed to pay $350 million already and then some, and the industry agreed to pay $20 billion, and what they got in return for that was not the most limited commitment that the government was willing to make in 1991, knowing that, in fact, that there was going to be a breach. The second part of this is that you interpret the contract in light of the statutory purpose, and the primary statutory purpose is to eliminate the accumulation—that's the language in Section 1 of the statute—the accumulation of spent nuclear fuel, and how do you do that? You don't do that by collecting less than half of the nuclear fuel that's being generated in any given year. The only way you do that is by finding a number, and that is the 1987 number, that is designed, in the first instance, to pick up all the fuel that's being produced and then some, so that you can eventually take in the backlog, so you eliminate, at a minimum, the accumulation. But there's no way, and this Court's already interpreted the contracts as consistent with the statutory purpose, that's the Rattler case, and therefore that language, it seems to me, clearly informs how the Court ought to interpret this particular contract. And the last of the three elements of this is that you pick up, eventually, I mean, that's the obligation, is eventually to pick up all the nuclear fuel, and again, if you're only doing it at 900 per year, you're never going to get there. So, it seems to me that, at a minimum, the Court of Appeals is clearly wrong on all these scores. The Court of Federal Claims is clearly wrong. She picked a number that was convenient for the government that sets a number that's too low and that just simply ought to be rejected. Now the question is, what number do you put in its place? And it seems to me there's sort of two alternatives that are available to you. One is to approach the case conceptually and say that the answer is that we're going to expect that the government's going to take all the nuclear fuel that's being created as it goes along, and eventually more than that, whatever those numbers happen to be. And that's kind of the Yankee number, right? Something closer to the Yankee number? I think that is consistent, certainly, with the Yankee analysis, because the judge there didn't want to designate a specific number. And then the other alternative... But that's not the accumulation problem, or the mitigation problem. That's kind of the whole contract. Right. But the question is, how are you going to deal with these issues across the range of all the various claimants who are out there, and what guidance do you send to the lower court? It seems to me you can send two sets of guidance. You can either send one that's going to be a big hole that was going to be built, and that hole was going to end up with a significant amount of spent nuclear fuel being placed in it, and it was going to be done in a way that would eliminate the accumulation, and ultimately, and eventually, eliminate all of the waste. And the numbers that sort of flow to that, obviously, would come from any reasonable efforts of mitigation that the parties have engaged in. The alternative is the one identified, Judge Rader, is to look at the 1987, because that's got specific numbers in it, and it reflects at least some judgment on both sides, at least probably less on our side, but at least some judgment on the other side, that this is a realistic way to try to approach this particular problem. But if I wanted to attack that, I'd say, come on, it was just a guess. You were all just guessing at that point. Right, but it was a guess that was based on the underlying purpose of the statute, which more comes in, because the one thing you could absolutely determine to a moral certainty was how much spent nuclear fuel you're going to have. I mean, those numbers you can calculate to the ounce at this stage, because it's so heavily regulated. So it's not a guess in that sense. What it is, is a reflection of, this is what we need in order to achieve what Congress wanted us to achieve, and then the question is, is there some reason to deviate from that based on anything in this contract? The answer to that is no, because that was not what the purpose of this contract was, and nothing in the activities of the contract detract from that. It's only when you get to 1991, and you let the government recognize that it's not going to be able to fulfill the agreement, and then it starts to come up with numbers that are so clearly driven by their litigation practices, that the court simply has to reject that under these circumstances. So our position is, at a minimum, the 87. Alternatively, the court could approach it conceptually either way, as long as the court sets aside the 900 MTU number that the trial judge relied upon, the judgment here has to be vacated and set aside, and we should be entitled, frankly, at the end of the day, to all of the damages that we requested. I'd like to take a minute to talk about the greater than Class C. Again, I'm not sure that I can improve on counsel's previous argument in that regard. I mean, the reality is, this is not a contract that says, implement the intent of the Nuclear Regulatory Commission. This is a contract that says, that if, in fact, the Nuclear Regulatory Commission adopts a rule that requires permanent isolation, then the GTCC waste is included as part of the contract. And the situation here seems to me very similar to the kind of situation... Don't we have to defer pretty heavily to their interpretation of their regulation in this setting? The answer to that is, if this were a preemption case, and the preemption standard said, adopt a rule, if there's a requirement adopted by the federal agency, then there's preemption of any state standard that's to the contrary. This comes up all the time. The court routinely holds that if you adopt a rule, whether or not you intended to preempt or not, means you've satisfied the requirement of the rule, of a requirement, and therefore, preemption follows. And the intent of the agency is not what counts. This contract is identical to that. What it says is, if the NRC adopts a rule that requires this kind of isolation, then the contract is triggered and the GTCC ought to be collected and it's part of the contract. Agency has acted that way. Its intent doesn't count. That's why you don't have to defer to it, because the contract doesn't look to the intent of the NRC. What it looks to is the effect of the rule. And here, clearly, the GTCC is a significant... I mean, it is like high-level radioactive waste. It may be someday it won't be. And it's possible that they'll adopt a new rule that comes up with an intermediate approach that doesn't require permanent isolation, and when that happens, then the contract will be applied in a different way. But as it stands today, and candidly for the foreseeable future, that isolation is going to be required by the rule. Finally, I'd take a second to talk about Graves and the expert testimony. The entire issue of exchange is not terribly critical in some respects to the analysis of the trial judge with a 900 MTU, but would be extremely important under any other kind of analysis. We would simply urge this court to follow the Yankee trial judge's analysis of the propriety of admitting that testimony. What weight you give to it is a sole, completely separate issue. But we're dealing with an abuse of discretion standard here, right? We are, but I think it's skewed to a certain... Abused discretion, you say? Oh, absolutely. Well, there are two ways to look at it. In the first place, it was analyzed against the backdrop of what was going to be a significantly lower MTU anyway, and so the exchanges are going to be distorted. But second, yes, ultimately it is an abuse of discretion to conclude that this evidence, which on grounds that solely go to the weight of the evidence. There's no question that he's an expert, there's no question that the methodology is one that's permissible, and the only question here is whether it would give much value to the trier effect. But that's a question that goes to weight, not to its admissibility, and therefore I do think it was an abuse of discretion, Your Honors. If there are no further questions, I would urge the Court to vacate right now. Thank you. Mr. Lester? May it please the Court? It's nice to be back. We've already obviously talked a lot about the rate, so I don't want to just re-plod around. I've already discussed, but I do want to make sure the Court is aware that ACR rate from 1991 that we're talking about is only a rate for the first 10 years of the program. We're not talking about a rate that's going out to the end of time. And that rate is in the contract identified as, or that the 91 date is the date that is identified as the key date here. In Article 4B-5A and B of the contract, which is the Joint Appendix 288 of this case, it talks about the 10-year outdates and the issuance of the 91 ACR-APR. In addition to being at a point where breach was anticipated, this is further from the contract formation than 87. Why wouldn't we say 87 is a more indicative rate of contract intent? We're not looking, though, at, again, it has to have a contract reference. There's no reference in the contract to an 87 date or an 87 plan. There is a reference to the 91 plan and that here is what the parties agreed to. And, in fact, the contract really can't work if we don't apply the 91, the DCSs that were approved. Those had to be submitted starting in 1992. But how does the 91 rate prevent the accumulation of spent fuel? I mean, it's so low that it can't possibly meet the intent of the contract. Well, that assumes, then, that this keep up with the accumulation and take some backlog in the early years of the program is the intent of the contract. And yet, there's nothing in the contract that states that. There's nothing in the statute that states that. And, in fact, as the administrative rulemaking comments show, there were lots of requests that those types of requirements be placed in the contract, and DOE did not do so. Even after the contract was formulated, there were representations by nuclear utility groups recognizing that no such things had been put in the contract and they wanted to try to negotiate to get them in there. No, the contract talked about taking everything. Maybe Yankee's right. And that is certainly DOE's current intent, is to take everything. But it won't be taken. It never was an obligation to take it all in 1998, in the first year. Again, this is a contract of long performance periods with potentially large ramp-ups for a very technically advanced... Okay, it's going to be a long period of time, and eventually you're going to take everything. If we take the 91 rate, doesn't that assume they're going to have to be mitigating all the way along? They're going to have to be building additional storage space, because they're going to be accumulating, as little as you're taking, they're going to be accumulating spent fuel at alarming rates. They can't just let it bubble in the pond there. Well, first, your honor, certainly this, again, the 91 ACR only covers the first 10 years. We don't know beyond that what the rates would be. However, the utilities would have been building on-site storage anyway, either in their pools or in dry storage facilities, and the issue is because certainly there was a long gap between this execution of the contract and the commencement of spent nuclear fuel in 1998. The utilities, as the statute requires in section 131, requires that the utilities bear the cost of that on-site storage until such times DOE accepts their fuel. To the extent that the contract did not require DOE to meet the tests that the utilities have attempted to promulgate or have argued before the trial court, then DOE didn't have that obligation. Now, certainly that might have been part of DOE's program goals, but it is not a contract obligation for which it should be held liable in damages for not satisfying. As I was saying, the DCSs have to be submitted in 1992 in order to get a 1998 outdate. They have to be submitted 63 months in advance of the actually requested pickup date. PG&E here did not challenge any of the DCSs that it submitted and that were approved until 2004 when it filed its lawsuit in this court and asked that basically the DCSs be thrown out and some new rate be set into the contract, even though it never requested that back in 1992-93 when it needed to if it had wanted acceptance rates in 1998 that were higher than those in ACR. The contract certainly provides for the possibility of challenges to DOE's acceptance rate requests. There is a disputes resolution process that utilities can go through, yet nobody elected to go through that process. Instead they acquiesced in the 91 rates. The government holds all the cards at this point and dictates the terms of what it's going to do for the next 10 years. It's not really fair to say that's the intent of the parties, is it? It's kind of what the government dictated that it would do. It's hardly what the contract is, the intent of the contract, really. Well, I think it is, Your Honor. I think it is. Does the government at least respond to the fact that it's apparent on the face, and the courts indeed have made the findings, that it was the dictated government rate. It was what you would do and there was no bargain for consideration on that point. Well, I have two responses, Your Honor. First, I don't think it is a dictated rate in that certainly DOE did identify the rate, but there is an appeal process that no one elected to pursue, but there is an appeal process that that rate can be challenged for abuse of discretion. But on the other hand, my second response is, the contract does provide DOE a lot of discretion in identifying the rates that will be used to accept the repository, and I think it has to, because DOE is the one that's having to use this repository, which is very technically difficult. It's never been done before. Even in 83, especially in 83, there were so many unknowns, questions about how can it be done, how quickly can it be done, what will we be able to accept, how fast can we do this? These are all things that DOE, only DOE knows how quickly it's going to be able to push through this program. If in the early years it needs a slower acceptance rate in order to allow itself to try to gear up into dealing with all these technical issues, then that potentially is something that then it has to do. But the contract allowed for that because it did not put in the minimum mandatory requirements that the utilities requested in 83, but that were not, in fact, included in the contract. If, in fact, the poor were to put these requirements into the contract now, it essentially would be putting in through the back door what the utilities were not able to get into the agreement back when they were actually discussing and negotiating the contract early on, and it would create a contract that the parties never agreed to, certainly that DOE never agreed to, and would create massive liabilities that simply are not based on any contract language, particularly with regard to the integration clause that shouldn't exclude any requirements that are not expressly stated in the contract. So why did the Department of Energy sign a contract at all if everything was so uncertain and so unpredictable and so completely unachievable? Section 42 U.S.C. Section 10222 does mandate that the Secretary enter into contracts with a January 31, 1998 start date. The statute, though, does not specify the rate at which DOE has to continue that acceptance after 1998. Now, Mr. Phillips identified that in the statute's straw man. We should disregard it. The contract's a straw man? Yes. You're kind of setting it aside here. No, I'm not. I'm sorry. I'm not. I'm sorry. I was turning to the purposes of—I was just responding to Mr. Phillips' comments about the purposes of the statute that should be read into the contract to require a certain rate of acceptance, focusing on the word accumulation in the statute. Congress was very clear in identifying specific purposes for the statute in Section 1131. None of them laid out the economic protection utilities and the necessity of accepting at the generation rate, particularly in the early years of the program. It would be very strange, indeed, if Congress intended to create this no reactor storage requirement when it was through sort of very vague one-word choice, when it was so clear by various sentences about what its specific statutory purposes were. Certainly, that one word should not be taken out of context in the statute to find a purpose that Congress did not intend. And then the contract itself, again, did not incorporate those requirements. Just returning to the GTCC issue, all I want to repeat is that although the utilities have argued that NRC is interpreting the standard contract in the NWPA, what it is really interpreting is its own rule where it said it is not now determining that GTCC requires permanent isolation. That statement by the NRC certainly requires substantial deference, and that statement would keep the NRC's definition out of the NWPA's definition. It's not a rule, is it? The rule was 10 CFR 6155 is a rule. That is a rule, yes, Your Honor. The explanatory information, though, was in the Federal Register comments in the promulgation of that rule, so it wasn't even a post-later interpretation or statement. It was a statement at the time of its promulgation interpreting what it meant. If there's nothing else to underline, we would ask the Court to confirm the next decision. Your Honor, I'll try to be brief. I think it's worth stepping back for a second and just putting ourselves in the context here. We're talking about an extraordinary breach of contract and extraordinary expenses that have been incurred by the utilities here. They have spent $20 billion pursuant to this contract. They have then spent literally hundreds of millions of dollars, if not more, as a consequence of the government's refusal to abide by that contract. The vast majority of those damages I submit to you are, in fact, legitimately mitigation damages. So the real question here for this Court under these circumstances is, is there some contrivance or some reason not to give the utilities the benefit of the mitigation damages that they otherwise would be entitled to? And the only argument that the government's got is the one that trial judge adopted here, which is to say, well, we can contrive a number that comes in years after the fact and gives us something that we can use as an excuse not to have to pay the mitigation damages that are otherwise warranted. And all of the reading of the contract and everything that you look at will never get you to that number, because there was never an agreement in 1991. All there was was a mandated process that was designed to deal with the details, the technical aspects of the delivery of these goods, not with the fundamental question of whether the government was going to provide anything close to compliance with its obligations under this particular agreement. Counsel for the government said on a number of times that there's nothing in there that talks about the purpose of this scheme being to protect the private interest here. Well, I submit to you that the private interests are not being protected when they spend $20 billion, give that much money to the federal government, and then are being asked to pay an additional all of the money in mitigation and not getting anything back for that. That's not protecting the private interests. That's recognizing that Congress insisted that this be handled as a contract and that the ordinary rules of contract law ought to apply in this context, and if they do, then we are entitled to the full measure of the mitigation damages, not the 21%, which is what we were given in this case. If there are no further questions, you're on our list. Thank you.